[No. 4392.   Decided May 5, 1903.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSEPH MEL-VERN, *Appellant*.

CRIMINAL   LAW — INFORMATION — JURISDICTION   OF   COURT — PRE-SUMPTIONS.

In a prosecution by information, it will be presumed, in support of the jurisdiction of the superior court, in the absence of a contrary showing, that the defendant was not at the time under indictment for the offense with which he is charged, that the court was in session, and that the grand jury was not in session when the information was filed.

SAME — QUASHING INFORMATION — GROUNDS.

Under Bal. Code, § 6892, prescribing the grounds for setting aside an information, it was not error for the court to refuse to quash an information upon the alleged grounds that no warrant had ever been issued for the arrest of defendant, that he had never had a preliminary examination, and that, at the time the information was filed, he was restrained of his liberty.

SAME — PROSECUTION   BY   INFORMATION — ALLEGATION   OF   PRERE-QUISITES.

The existence of the facts or conditions which the statute enumerates as prerequisites to the right to prosecute by information need not be set forth in the information itself.

SAME — JURISDICTION OF PERSON OF ACCUSED.

The fact that a defendant was arrested, in the first instance, by a person not having a lawful warrant therefor would not be

ground for reversal of the judgment for lack of jurisdiction of the person of defendant, when it appears that he was in fact in the custody of an officer, was present in court on the day of his arraignment, entered a plea of not guilty, and was in court throughout the trial.

TRIAL — COMPETENCY OF EXPERTS — BY WHOM DETERMINED.

The competency of a witness to express an opinion upon a professional or scientific matter is a preliminary question for the trial court to decide.

SAME — OBJECTIONS TO EVIDENCE — WITHDRAWAL.

Objections to testimony will not be considered on appeal, when the objections were immediately withdrawn in the trial court, after being made there.

SAME — TIMELINESS OF OBJECTIONS..

An objection to a ruling of the court on the admission of evidence must be interposed, under Bal. Code, § 5055, at the time it was made, and not afterwards.

WITNESSES — CROSS-EXAMINATION OF ACCUSED.

Cross-examination of the accused, when testifying in his own behalf, as to his past life, conduct, habits, and associates was proper, where, in his direct examination, he had given testimony as to his life, occupation, and habits at the various places where he had resided from childhood down to date of the crime with which he was charged.

SAME — CREDIBILITY.

Where an accused testifies in his own behalf, he is subject to cross-examination to impair his credit as a witness to the same extent that any other witness is.

MURDER — EVIDENCE — TESTIMONY OF NON-EXPERTS.

Testimony relative to the probable distance at which a revolver was held from the head of deceased when it was discharged by one who had experimented with the revolver for the purpose of ascertaining at what distance powder marks similar to those on the face of deceased would be produced is not expert testimony and therefore would not require that the witness qual-- ify as an expert.

SAME — INSTRUCTIONS — OVERCOMING PRESUMPTION OF MURDER IN SECOND DEGREE.

An instruction that "where a homicide is proved beyond a reasonable doubt, the presumption is that it is murder in the second degree. If the state would elevate it to murder in the first degree, it must establish the characteristics of that crime, and if

the prisoner would reduce it to manslaughter the burden is on him," is not open to the objection that it charges the jury the burden is on defendant to prove himself not guilty of murder in the second degree.

SAME — INTEREST OF ACCUSED.

An instruction that the jury have a right to take into consideration the interest in the verdict of a defendant who has testified in his own behalf is not erroneous on the ground of prejudicing the defendant by specially directing attention to his testimony.

SAME — ACCUSED AS WITNESS — FALSUS IN UNO FALSUS IN TOTO.

An instruction that a defendant upon the witness stand subjects himself to all the rules governing the credibility of witnesses, among them the rule that if the jury believe any witness has sworn falsely as to anything material to the issues, they are at liberty to disregard his entire testimony, except where it is corroborated, is a correct statement of the law.

Appeal from Superior Court, Snohomish County.—Hon. JOHN C. DENNEY, Judge. Affirmed.

*J. W. Heffner* (*S. A. Bostwick*, of counsel), for appellant.

*H. D. Cooley,* Prosecuting Attorney, for the State.

The opinion of the court was delivered by

ANDERS, J.—The defendant, Joseph Melvern (appellant here), was convicted in the superior court of Snohomish county of murder in the second degree, upon the trial of an information charging him with murder in the first degree for the killing of one Clara Melvern by shooting her with a pistol. A motion for a new trial was filed and overruled, and the court thereupon sentenced the defendant to the penitentiary for the period of twenty years. The information on which the appellant was tried was filed on March 1, 1902. On April 28, 1902, the appellant filed a motion to set aside the information, which motion was denied and an exception noted. Immediately

thereafter a demurrer to the information was filed which°
the court overruled, to which ruling the appellant excepted.
The superior court was asked to quash and set aside the
information upon the ground that the defendant had been
held and confined in the jail of Snohomish county, Wash-
ington, since February 21, 1902, without due process of
law, for the reasons: (1) That no warrant had ever been
issued for his arrest upon any charge; (2) that he had not
been held by virtue of any warrant issued upon any
charge; (3) that the defendant had never had a prelimi-
nary examination in this cause before any committing
magistrate; (4) that at the time the information in this
cause was filed the defendant was restrained of his liberty,
and, by reason of the premises, the court had no jurisdic-
tion over the person of the defendant. . This motion was
based on the affidavit of the defendant, filed therewith,
and the records of the cause. It is insisted by the learned
counsel for appellant that the court erred in denying this
motion for the reason that the prosecuting attorney had
no right or jurisdiction, under § 6802, Bal. Code, to file
the information prior to the filing of a complaint charging
the appellant with the commission of an offense, and a
hearing thereon before a committing magistrate. Subdi-
vision 4 of said § 6802 provides that offenses may be pros-
ecuted in the superior courts by information, "Whenever
a public offense has been committed, and the party charged
with the offense is not already under indictment therefor,
and the court is in session and the grand jury is not in ses-
sion or has been discharged;" and there is nothing in the
affidavit upon which the motion was based, or elsewhere
in the record, showing that the appellant was already un-
der indictment, that the court was not in session, or that
the grand jury was in session, at the time the information

was filed. And, inasmuch as the superior courts of this state are courts of general jurisdiction, it must be presumed that the trial court had authority to entertain a prosecution of the appellant by information, although the record does not affirmatively show the existence of the conditions under which an information may be filed. In other words, it will be presumed, for the purposes of this case, in the absence of a contrary showing, that the appellant was not already under indictment for the offense with which he was charged, that the court was in session and that the grand jury was not in session when the prosecuting attorney filed his information. See *State v. McGilvery,* 20 Wash. 240 (55 Pac. 115) ; *Nichols v. State,* 127 Ind. 413 (26 N. E. 839). Moreover, no provision is made by our statute for quashing an information upon the grounds specified in appellant's motion. See Bal. Code, § 6892. We think the motion to set aside the information was properly denied.

It is also claimed that the court erred in overruling the appellant's demurrer to the information. The demurrer was predicated upon two propositions, the first one being that the information did not substantially conform to the requirements of the Code, and the second that the facts charged did not constitute a crime under the laws of the state of Washington. And it is argued in support of the demurrer that the information does not allege the existence of the conditions necessary to authorize the prosecution of appellant by information, and particularly that it does not aver that appellant had been held to answer the charge preferred against him, by a duly authorized magistrate. This contention is untenable. It has been held, on several occasions, by this court, that the existence of the facts or conditions which the statute enumerates as pre-

requisites to the right to prosecute by information need not be set forth in the information itself. See *State v. Anderson,* 5 Wash. 350 (31 Pac. 969); *State v. Munson,* 7 Wash. 239 (34 Pac. 932). And the ruling of this court upon this question seems to be in accordance with the decisions of the courts of other states, under statutes similar to ours. See 10 Enc. Pl. & Pr. 460, and cases cited in note 1: It is shown by the above mentioned affidavit that no warrant was ever issued for the arrest of the appellant, and it is, therefore, strenuously insisted that the court never acquired jurisdiction of the person of appellant, and consequently had no right to compel him to go to trial. But it appears that appellant was in fact in the custody of an officer, that he was present in court on the day of his arraignment, that he entered a plea of not guilty to the information, and that he was in court throughout the trial. Under these circumstances we have no doubt that the court had jurisdiction of the defendant. See 1 Bishop, New Criminal Procedure, § 179; *Kerr v. Illinois,* 119 U. S. 436 (7 Sup. Ct. 225); *State v. Ray,* 50 Iowa, 520. We are unable to perceive why the alleged irregularity in the manner of bringing the appellant before the court entitled him to immunity from trial for the offense with which he was charged in the information. The court might have caused a warrant to be issued for the arrest of appellant at the time of the trial, but that was unnecessary, because he was already in court in charge of the sheriff. There is nothing in the record indicating that he objected to the manner of his arrest or detention, at any time prior to the day of trial. If he was illegally restrained of his liberty while in the county jail, he might have obtained redress by an appropriate proceeding in court; but the mere fact that he was arrested, in the first instance, by a person not

having a lawful warrant therefor, and detained by him, constitutes no ground for the reversal of the judgment.

At the close of the state's evidence counsel for the defendant requested the court to direct a verdict of acquittal. The court declined to direct the jury as requested, and its action in that regard is assigned as error. The evidence adduced by the state tended to support the allegations of the information and therefore the court did not err in denying the defendant's motion. The evidence on the part of the state tended to establish the following facts: In the month of September or October, 1900, appellant was engaged as a piano player in a certain saloon and dance hall in the city of Portland, Oregon. He there became acquainted with deceased, then known as Gertie Ambrose, and in about two weeks they began to live together as husband and wife, and thereafter she was known as Clara Melvern. After living together two or three months in Portland, they moved to Everett, and afterwards to Snohomish, Washington. During the time they resided in Portland, the appellant, on several occasions, while under the influence of liquor, ill-treated and abused the deceased, Clara Melvern, without any apparent reason therefor. At one time he struck her over the head with a pistol; at another, pulled her hair, and still at another stabbed her with a knife, thereby inflicting a wound which confined her to her bed for two or three weeks, and which left a scar which was visible upon her body after death. He threatened to kill Clara "if she ever done any trifling on him." In July, 1901, and for several months thereafter, appellant and the deceased lived in a "shack" in the city of Everett. Within twelve feet of this shack lived a family by the name of Parker. On one occasion Mrs. Parker was awakened by a sound as if the deceased was being

choked.   She testified that she heard the deceased cry out, and then it sounded as if she was being smothered about the throat.   On other occasions this witness was awakened in the night by loud talk by appellant, but could not understand what he said.   About one o'clock one night in February or March, 1901, appellant and the deceased went to the Summit hotel, in Everett, and engaged a room.   Soon after their arrival, Mrs. Lindsay, the proprietor, hearing a disturbance, went out into the hall where they were to ascertain what they were doing.   The appellant was then trying to take something out of his trunk, and the deceased was trying to prevent him.   Mrs. Lindsay conducted them to their room and then went to bed.   She heard some noise after they went into the room. followed by a crash, which was afterwards shown to have been caused by a pistol shot, fired in their room, breaking the mirror on the "dresser."   A witness, who was sleeping in an adjoining room on that night, heard the shot, and immediately thereafter heard a man in the room where the shooting occurred say, "I'll let you know when I'm going to kill you."   At the time the appellant and the deceased came to the hotel no indication of a wound was noticed upon the face or forehead of the deceased; but the next morning her head was tied up, and she had a wound on her forehead over her eye which she, in the presence of the appellant, said she received the previous night by falling on the sidewalk.   The following further facts are fairly established by the state's evidence, as they are practically undisputed:   For about six weeks prior to the death of the deceased, she and the appellant lived over a laundry in the city of Snohomish, occupying two rooms, in one of which—the bed-room—the death occurred.   The room across the hall from their bed-room was occupied by one

Thiessen, and the room adjoining theirs was occupied by one Anderson. Mr. and Mrs. Johnson, the proprietors of the laundry, slept in the room next to the one occupied by Thiessen. On or about January 15, 1902, Anderson was awakened by some kind of an altercation in the room occupied by appellant and the deceased. He recognized appellant's voice, and heard a woman crying and declaring "I didn't." On several other occasions the same thing occurred in this room. One night, about the 22d of January, Anderson heard some kind of a tumult in their room, which he says sounded "like they made a rush from the kitchen, or the next room to it, in towards the wall, against the wall where I was sleeping, and bumped against the wall." It sounded like a heavy bump against the wall just above where their bed was standing. Following this he heard some one crying or sobbing, the sound appearing to come from "right close up to the wall." About four o'clock in the afternoon preceding the night of the alleged homicide, a witness, Mrs. Heppell, saw both the appellant and the deceased in their rooms in the laundry building. At that time the face of the deceased "was kind of colored up, and her eyes were red like she had been crying." From seven till ten or eleven o'clock on the night of the shooting the appellant was in the Magnolia saloon, in Snohomish, and engaged in playing the piano. From about twelve o'clock until about one o'clock he was in the Rainier saloon, playing cards. He drank some beer and lost some money at cards, and seemed to be restless and nervous. After he quit playing, he pulled his hat down over his eyes and sat there a short time in silence. Then he got up and walked out, and, in about a quarter of an hour after he left the saloon, the shot that killed Clara Melvern was fired. Mr. Johnson, who, with his wife, was sleeping in

his room across the hall from the rooms occupied by appellant and the deceased, testified that, between one and half-past one o'clock on that morning (February 21, 1902), he heard the appellant come up stairs and go into his room. "He walked a little faster than usual, and it was almost a run, you might call it." "Well, when he came up he walked almost in a run to their door, and opened it, and went in, and as soon as he got in I heard him talking to her, but I couldn't hear what he said." When he went into the room, the door was slammed shut. The talking continued for about ten minutes after he went in, and then it was quiet for five or six seconds. Then a shot was heard, followed by silence for fifteen or twenty seconds. Then the appellant opened the door of his bed-room, crying "fire" or "help," and went across the hall to the room occupied by the Johnsons, and told them his wife had shot herself, and asked Mrs. Johnson to go and help her. He was then completely dressed. The witness Thiessen was awakened by the talking in appellant's room. He did not understand what appellant was saying, but he heard the deceased say, "I didn't," which words were "hallooed out loud." Then he heard a shot, and heard something fall. As soon as appellant came to their door and gave the alarm, Johnson and his wife rushed to his room, without stopping to dress themselves. Mr. Johnson went into the bed-room and Mrs. Johnson stopped in the open doorway, which, as we understand the evidence, was about seven feet from the bed, the head of which was against or near the wall opposite to the door. When Johnson went in, he saw Clara Melvern lying on the floor, near the right side of the bed, ·ɔking from the head towards the foot, "flat on her back, with her hands down at the side." Her feet were up to the head of the bed and

her head towards the door, but her body was not parallel with the bed. The back of her head was squarely on the floor, and where her head lay there was blood upon the matting on the floor. Her hands were open and her head was two feet and eight inches out from, and nearly even with, the foot of the bed. Mr. Johnson further testifies that Mrs. Melvern never moved while he was in the room, and that she was dead when he went in. Mrs. Johnson, however, thought she saw her "straighten out and turn her head to one side." But in this she must be mistaken, as other persons who came into the room a short time after Johnson entered found the body and head of Mrs. Melvern lying exactly in the position described by him. If she turned her head to one side, it would follow that the back of her head did not lie, as the other witnesses testified, "squarely on the floor." Soon after Mr. Johnson went into the room where the shooting occurred, he discovered a revolver, which was owned by appellant, lying midway between the sides of the bed, and about two feet from the foot-board, the muzzle pointing towards the head of the bed. After Johnson went into appellant's room, the latter went out in search of a physician, leaving Mrs. Melvern still lying on the floor. Johnson then dressed himself, and went out and told a policeman what had occurred. When he returned, he found the body of the deceased lying in the position in which he first saw it. A physician and the appellant were there, and a policeman was either in the room at the time or came in immediately thereafter. The doctor pronounced Mrs. Melvern dead, and noticed a bloody wound on the right side of her head. The policeman picked up the revolver, which was still lying on the bed, put it in his pocket and left the room, taking appellant with him. The pistol was a large one, and, at the

time the policeman took charge of it, the cylinder contained one empty and four or five loaded shells. In the afternoon succeeding the morning on which the deceased was killed, a jury was summoned by the coroner, and an inquest was held on the body of the deceased. It was found that there was a pistol shot wound on the right side of the head of the deceased, surrounded by powder marks covering a space about four inches in diameter, and that the bullet entered the head about two inches above the outer angle of the right eye, and ranged downward and backward, coming out two inches in front of the external opening of the left ear. A bruise was also discovered upon her face, consisting of four distinct marks, connected by a slight discoloration of the skin. There was a bullet hole in the plaster on the right side of the room, six feet and three inches above the floor, and the bullet was found lying on the floor immediately beneath this point.

We have thus set forth somewhat in detail, though not in full, the testimony given in behalf of the state, in order to show substantially what evidence was before the court at the time it refused to direct a verdict in favor of the defendant. It was conceded that the deceased came to her death from a shot from appellant's revolver, and that no one was in the room at the time of the tragedy except appellant and the deceased. But, it was contended in the court below, and is contended here, that the deceased herself fired the fatal shot, with suicidal intent. Upon the trial the appellant took the witness stand, and gave his version of the manner in which the deceased was killed. He stated, in substance, that he reached his room some time between one and two o'clock, and found the deceased up and dressed, and attending to her household affairs;

that they had a conversation, during which he told her he had secured steady employment; that they had no quarrel, and no unpleasant words passed between them; that while they were talking he lay down on the bed without removing his clothes, and while there with his eyes closed, he heard a click or clicks, which must have been the sound made in cocking the revolver, and that this sound seemed to be right over his head by the side of the bed. As to what he heard and thought, as he was lying on the bed, immediately before he heard the report of the pistol, appellant testified at the coroner's inquest as follows: "I heard a kind of a click after I had been there ten or fifteen minutes may be. I didn't know what the click was, but thought she was pulling the cork out of the bottle to take a drink, and then I heard another click, and now I know it was when she was cocking the gun; but I was still wondering or thinking that she was taking a drink, and taking the cork out of the bottle, and wondering why it should make two or three clicks; I was thinking of that, and trying to understand how it was, when I heard the report of the gun." The appellant's eyes, according to his testimony, were closed when the shot was fired, but he instantly opened them, and saw the deceased in the act of falling to the floor. He sprang from the bed, and looked at her, but made no examination of her body to ascertain where she was shot, or the nature of her injuries. He did not attempt to raise her up, or to place her on the bed; did not touch her at all; but went for the doctor, after notifying the Johnsons that she had shot herself, leaving her lying on the floor just as she fell. The appellant, on his examination in chief, by his counsel, denied generally that he had ever mistreated the deceased in any manner whatever, and especially denied that he

shot at or towards her at any time while they were living together in Portland, and declared that the deceased herself fired the shot on the occasion mentioned by the witness for the state, while he was lying upon the bed in the outer room.  But appellant says he does not know what she was doing, or going to do, with the pistol at that time, and does not remember what conversation was had between them, if any, in regard to that matter.  He testified that the pistol shot which was heard in the room occupied by himself and deceased in the Summit Hotel was also fired by the deceased; that the crying heard by Mrs. Parker and other witnesses might have been caused by the toothache from which she was suffering, or by some little quarrels which they may have had.  As to the stabbing of deceased, appellant claimed it was purely accidental and occurred while he was trying to take a knife out of the hands of the deceased; and that neither of them was angry at the time, or was aware that any injury had been inflicted, until a minute or two after it occurred.  "We were still standing there laughing when she felt the blood; that was the first we knew she had been cut."  The appellant admitted, however, that the wound was of such severity as to cause the deceased to remain in bed for a period of two or three weeks.  The appellant further testified, in effect, that the noise which the witness Anderson heard, on the occasion mentioned by him, which sounded as if some person was thrown against the wall, must have been caused by appellant and deceased while they were scuffling and playing in their room; that the witness Regreth was mistaken in believing that he heard the words, "I'll let you know when I'm going to kill you" uttered in the room in the hotel immediately after the report of the pistol; and that the witness Thiessen

must have been mistaken in thinking he heard the deceased say, "I didn't" in a loud tone of voice, just a few seconds before the shot was fired; or, if such words were spoken on that occasion or at any other time, they must have been used "in relation to staying in town or going away." "It would come about, for instance, if I would say that she wanted to stay in town, and she would say she didn't want to stay." Concerning the wound which Mrs. Melvern received upon her forehead over her eye, in Everett, and which Dr. Stauffer was called to treat, the appellant testified that it was caused by falling from the sidewalk while she and appellant were taking a walk, about midnight, before going to the hotel. This wound, according to the testimony of the doctor, was a jagged one, about three-quarters of an inch long, and "was quite a deep cut", "and had to be stitched up." But Mrs. Lindsay saw no bandage upon her head, or blood or dirt upon her face or dress, when they came to her house, or when she was showing them to their room. After the appellant was placed in custody, he was taken to the Magnolia saloon by the policeman, where he remained for some time. He spent the remainder of the night with another man in a room over the saloon. At no time during the night did he explain the circumstances connected with the tragedy. On the contrary, when he was interrogated by a certain person in the saloon as to the particulars of the transaction, he responded, "You are trying to pump me, are you?" and on being informed that that was not true, he said, "Well, if you had seen yourself, you would know you was."

The theory of the defense is that the deceased, at the time of the shooting, stood with her right side near or against the head of the bed, on the spot where her feet

rested after death; that she held the revolver in her right
hand, and pointed it at her right temple, and, while doing
so, inclined her head slightly towards the pistol, thereby
giving the bullet a backward and upward course through
the head and towards the point where it struck the wall;
that the recoil and weight of the weapon straightened out
the arm at full length, and, while the body was falling,
the pistol naturally fell upon the spot where it lay upon
the bed, which would be about nineteen inches from the
hand if the arm was extended at full length; and that
when the body had fallen to a point on a level with the
bed, the bed would strike the arm and throw it along and
parallel with the body as it lay upon the floor. And coun-
sel for the appellant insist that their theory of suicide is
the only reasonable one in view of the evidence in the
case. On the other hand, the learned counsel for the state
earnestly contends that the facts and circumstances, includ-
ing the story told by appellant as a witness in his own be-
half, disclosed by the record, completely negative the the-
ory of death by suicide. The theory of the prosecution is
that the pistol was fired by the appellant as he lay upon
the bed, and while the deceased was in a stooping posi-
tion by the side of the bed. And it is argued in behalf
of the state that the unnatural and almost impossible po-
sition in which the pistol must necessarily have been held
by the deceased if she fired the shot, the distance it was
held from the head at the time it was discharged, the course
of the bullet through the head, the relative positions of the
body and the revolver as seen by Johnson when he rushed
into the room, the frequent altercations between appellant
and the deceased, the conduct of appellant in the Rainier
saloon just prior to going to his room, his hurried man-
ner in going up the stairs and through the hall to his room,

and his conduct after the shooting are circumstances clearly inconsistent with appellant's innocence. The testimony as to these several matters has already been indicated in a general way. At the trial several physicians were called on the part of the state, as expert witnesses, who were of the opinion that the shot through the brain of the deceased produced instant death, and that, where sudden death is caused by such means, there can be no voluntary muscular movement on the part of the person killed, and in cases of suicide the pistol will ordinarily be found firmly grasped in the hand. The testimony of these witnesses seems to accord with the views expressed in the works on medical jurisprudence to which we have had access. In Vol. 3, § 302, of the fourth edition of Wharton & Stille's Medical Jurisprudence, it is said:

"In cases of suicide the weapon may be found grasped in the hand or not, according to the manner of death. Thus, if death ensue upon sudden and abundant hemorrhage, as in wounds of the throat, stabs in the heart or great vessels, the person dies by syncope, and hence, the hand being relaxed, the weapon falls from it. When, however, death is occasioned by a pistol-shot through the head, the weapon will, in most cases of suicide by this means, be found firmly grasped in the hand. In other cases where death has not been immediate, it is purely a matter of accident whether the weapon be still held by the deceased or not. In like manner, the position of the body will be affected by the suddenness and mode of death. Where death is sudden, the body will usually be found lying upon the back, but, if it have not been immediate, the face and trunk will generally be turned to the ground."

It is objected that neither of these physicians was competent to testify as an expert. The question of the competency of a witness to express an opinion upon a professional or scientific matter is a preliminary ques-

tion for the court to decide, and we do not think that the decision of the court in this instance is open to the objection urged against it.

At the trial one Woodard, a witness for the state, testified to some difficulty he and appellant had over the deceased, which occurred some time before the deceased and the appellant began to live together as husband and wife. And counsel for appellant claim that this testimony was irrelevant, and immaterial, and incompetent for any purpose. That it was subject to the objection now urged against it must be conceded, but, inasmuch as the objection which was made to the testimony was immediately withdrawn, it cannot be considered by this court.

During the progress of the trial one Miller, a witness for appellant, was recalled for further cross-examination by counsel for the state; and after he had testified that the appellant was in his saloon immediately after the death of the deceased, and that he then had a conversation with him in which something, but not much, was said about the shooting, he was asked if Melvern did not on that occasion say to him: "If I do have to die, I don't want to be hung," and this question was answered in the negative. The witness was then asked if he did not, at a time and place mentioned, tell Harry Knowles that appellant, Melvern, had so stated, and he answered that he did not. Both of these questions were asked and answered without objection. Subsequently Knowles was placed upon the stand by the state and interrogated as to this conversation, and counsel for the appellant then stated to the court, in effect, that they had objected to Mr. Miller testifying, or to Mr. Cooley asking Mr. Miller, for the purpose of cross-examination, any questions touching any conversation that was had in the saloon on the night that

Melvern was there immediately after the death of the deceased on the ground and for the reason that it was not proper cross-examination, and, if the state was allowed to do so it would be bound by the evidence. This was not properly an objection, but merely a statement that counsel *had* objected. An objection to a ruling of the court must be interposed, under our statute, at the time it was made, and not afterwards.

Objection is made by appellant to the testimony of Bakeman relative to the probable distance at which the pistol was held from the head of deceased when it was discharged, on the ground that the witness was not shown to be qualified to give testimony upon that subject. But it is a sufficient answer to this objection to say that the witness did not testify as an expert. Expert evidence was not required. This witness testified that he had measured the area covered by the powder marks upon the face of the deceased, and that he afterwards experimented with the same pistol that was found in appellant's room, as above stated, using the remaining cartridges, and discharging them at and against a piece of fresh hog skin at different distances; and he told the jury which shot caused marks upon the hog skin similar in extent and appearance to those upon the face of the deceased. He further informed the jury that when this shot was fired the muzzle of the revolver was nine inches from the point struck by the powder. We think that this testimony, though given by a "layman," was entirely proper. Moreover, similar experiments were made by a witness for appellant, who, using the same pistol, but a different kind of cartridges, fired at the smooth surface of a board. Nor do we think that the court erred, under the circumstances, in restricting the cross-examination of the witness Bakeman.

It is next alleged that the court erred in permitting counsel for the state, in the cross-examination of appellant, to propound certain questions to appellant touching his past life, conduct, habits, and associates, and in compelling him to answer the same over the objections of his counsel. It is claimed that these questions were objectionable on the grounds, (1) that they were incompetent and immaterial, and, (2) that it was not proper cross-examination. It appears from the record that the appellant, in his examination in chief, gave testimony as to his life, occupation, and habits at the various places where he had resided from the time of his childhood down to the date mentioned in the information. He thus laid the foundation for cross-examination upon matters which, in the absence of such testimony, might possibly have been deemed immaterial and irrelevant. Some of the questions objected to were unquestionably proper on cross-examination, even under the strict rule invoked by appellant. Others were apparently propounded for the sole purpose of impairing the credibility of the appellant, but these were answered in the negative, and the state was bound by the answers, and did not attempt to contradict him, as was done in *State v. Payne,* 6 Wash. 563 (34 Pac. 317), cited by appellant. Under our constitution a defendant in a criminal case can not be compelled to give evidence against himself, but when he voluntarily offers himself as a witness in his own behalf, and so testifies, he is "subject to all the rules of law relating to cross-examinations of other witnesses." Bal. Code, § 6941; Pierce's Code, § 2165. And, in case the accused testifies in his own behalf, he is subject to cross-examination to impair his credit *as a witness* to the same extent as any other witness is (Abbott, Trial Brief [Criminal Causes], § 396, and cases

cited); and, generally may be impeached in the same
manner as any other witness (*State v. Duncan,* 7 Wash.
336, 35 Pac. 117, 38 Am. St. Rep. 888), "by reputation
as evidence of character, by cross-examination to charac-
ter, by conviction of crime, and the like;" "for otherwise,
if he were a false witness, the customary methods of expos-
ing this would not be available, and the investigation of
truth and the punishment of crime would be defeated."
1 Greenleaf, Evidence (16th ed.), § 444b.    See, also,
Chase's Stephen's Dig. Ev. (2d ed.), art. 129, and especi-
ally note 2 and cases cited; Clark, Criminal Procedure, p.
550.    It has also been held that if one charged with crime
testifies for himself, and denies his guilt, he may be cross-
examined as to any matters tending to establish guilt,
whether specifically interrogated as to them or not.    Ab-
bott, Trial Brief, *supra,* § 394.    See, also, *State v. Dun-
can, supra.*    In view of the scope of the direct examination
of appellant, and of the rules governing the cross-examina-
tion of witnesses, we conclude that the objection in ques-
tion ought not to be sustained.

It is alleged that the court erred in giving to the jury
instruction No. 16, which is in the following language:

"The court instructs you that where a homicide is
proved beyond a reasonable doubt, the presumption is that
it is murder in the second degree.    If the state would
elevate it to murder in the first degree, it must establish
the characteristics of that crime, and if the prisoner
would reduce it to manslaughter the burden is on him."

The objection to this instruction is that it "clearly tells
the jury that the burden is upon the defendant to prove
himself not guilty of murder in the second degree."    But
we do not think that the instruction is susceptible of such
interpretation.    The language is unambiguous, and its
meaning apparent.    A substantially similar instruction

was considered and sustained by this court in *State v. Payne,* 10 Wash. 545 (39 Pac. 157), on the authority of *State v. Cain,* 20 W. Va. 679, 709; *Hill v. Commonwealth,* 2 Grat. 594, and other cases cited in the opinion, and 2 Thompson on Trials, § 2208. This instruction is an exact copy of the form of an instruction given by Thompson in the section of his work on trials above noted; and the learned author, in a foot note to said section, says that, "The principle embodied in the above instruction is believed to be universally acknowledged."

The appellant also objects to instructions No. 18 and No. 21, given by the court, which are respectively as follows:

"18. You are further instructed that, while the law makes the defendant a competent witness in this case, yet you have the right to take into consideration his situation and interest in the result of your verdict, and all the circumstances which surround him, and give to his testimony only such weight as in your judgment it is fairly entitled to."

"21. If the jury believe from the evidence that any witness in this cause has wilfully sworn falsely on this trial, as to any matter or thing material to the issues in the case, then the jury are at liberty to disregard his entire testimony except insofar as it has been corroborated by other evidence, or by the facts and circumstances proved on the trial. The defendant in this case having gone upon the stand as a witness in his own behalf, subjects himself to all the rules governing the credibility of other witnesses, and this instruction applies equally to him as well as to any other witness."

It is not claimed on the part of the appellant that these instructions do not state the law correctly. The only complaint is that the appellant was unnecessarily prejudiced by thus directing the attention of the jury especially to him. Instructions substantially like ·instruction

No. 18, in the case at bar, have been frequently sustained by the courts. See *State v. Sterrett,* 71 Iowa, 386 (32 N. W. 387); *People v. Calvin,* 60 Mich. 113 (26 N. W. 851); *Haines v. Territory,* 3 Wyo. 167 (13 Pac. 8); *State v. Elliott,* 90 Mo. 350 (2 S. W. 411); *Territory v. Gonzales,* 68 Pac. 925, 932; *People v. Cronin,* 34 Cal. 204; *Anderson v. State,* 104 Ind. 467 (4 N. E. 63); *State v. Sanders,* 76 Mo. 35; 2 Thompson, Trials, § 2445.

In *Haines v. Territory, supra,* the instruction objected to was practically similar to that here under consideration, and, in regard thereto, the court said:

"It is conceded that the above instruction contains nothing but sound legal propositions, and the only complaint made is that defendants were singled out by the court from the body of the witnesses for comment. We do not think the court erred in giving the instruction as it did."

Nor do we perceive any error in the 21st instruction. It certainly states the law correctly, and it would therefore seem to be unobjectionable. *Rider v. People,* 110 Ill. 13. See, also, *Spies v. People,* 122 Ill. 1 (12 N. E. 865, 3 Am. St. Rep. 320).

Lastly, we are asked to reverse the judgment and dismiss the action upon the ground that the evidence is not sufficient to sustain the verdict. The evidence is exceedingly voluminous, and, we think, in some respects unnecessarily circumstantial. We have carefully read and considered all of the evidence, and we deem it sufficient to warrant the verdict of the jury.

No substantial error appears in the record, and the judgment is therefore affirmed.

FULLERTON, C. J., and DUNBAR and MOUNT, JJ., concur.