[No. 9598.   Department One.   February 10, 1912.]

THE STATE OF WASHINGTON, *Respondent*, v. DELLA TOTTEN, *Appellant*.[1]

HOMICIDE—JUSTIFICATION—EVIDENCE—ADMISSIBILITY — WITNESSES —CONTRADICTION.   Upon a prosecution for homicide occurring in an altercation over a fence placed and defended by the accused in a private way, which was the only road for vehicles to the home of the deceased, evidence that a team could have been driven around the fence, by making a short detour over untraveled ground and an old logging road, is not admissible for the purpose of contradicting a witness for the state who testified that the private way was the only road for vehicles to the home of the deceased.

SAME — STATE OF MIND OF ACCUSED — EVIDENCE — ADMISSIBILITY. Neither is such evidence admissible as bearing on the state of mind of the accused when she shot and killed the deceased for tearing down the fence which she had helped her mother place in the road for the purpose of closing the road to the family of the deceased for its entire way.

SAME—JUSTIFICATION—EVIDENCE—ADMISSIBILITY.   Neither is such evidence admissible to relieve the accused from being put in a bad light before the jury, as attempting to block the deceased from access to his home, where it was admitted that the purpose of the fence was to stop all trespassing by use of the only traveled road, especially where the court instructed the jury that the deceased was an unlawful trespasser, and that his destruction of the fence was an unlawful act which the accused had a right to resist to any degree short of taking human life.

[1] Reported in 121 Pac. 70.

SAME—STATE OF MIND OF ACCUSED—EVIDENCE—ADMISSIBILITY. In a prosecution for a homicide occurring in a quarrel between the deceased and the mother of the accused, which quarrel the accused took up three or four hours before the homicide, evidence of what occurred between the contending parties some time prior thereto, and of an offer by the mother of another way, is inadmissible for the purpose of showing the state of mind of the accused at the time of the homicide, where it is not shown that she was informed of the prior occurrences or of such offer.

SAME—EVIDENCE—DECLARATIONS OF ACCUSED—SELF-SERVING DECLARATIONS. Upon a prosecution for homicide, statements, not part of the *res gestae*, made by the accused to her husband expressing fear of the deceased and members of his family, are inadmissible as declarations of the accused made in her own favor.

HOMICIDE—DEGREES—MANSLAUGHTER — INSTRUCTIONS. Under the statute providing that homicides committed in certain ways shall constitute murder in the first degree, and if committed in certain other ways, murder in the second degree, and all other homicides, not being excusable or justifiable, shall be manslaughter, it is not error in defining manslaughter to use the words "voluntarily" and "involuntarily" as excluded in the definitions of first and second degree murder; and such words are not confusing as capable of a varied meaning without any further definition.

HOMICIDE—MANSLAUGHTER—PRESUMPTIONS—BURDEN OF PROOF—INSTRUCTIONS. An instruction that, a homicide being proven and murder in the second degree presumed, the burden upon the defendant to reduce it to manslaughter is sustained if, from all the evidence or want of evidence, the jury entertain a reasonable doubt as to defendant's guilt, is not objectionable as telling the jury that before the burden of reducing a homicide to manslaughter is sustained the jury must entertain a reasonable doubt of defendant's guilt.

HOMICIDE — INSTRUCTIONS — PRESUMPTIONS OF INNOCENCE. In a prosecution for homicide, an instruction that the presumption of innocence continues until it has been overcome by the evidence of the prosecution, beyond a reasonable doubt as to each and every material fact, is not open to the objection that the presumption of innocence could be overcome if the jury believed the evidence of the prosecution, without reference to the evidence of the defense, where in other instructions the jury were told that the whole of the testimony bearing upon any particular fact must be considered in arriving at a conclusion as to such fact.

Appeal from a judgment of the superior court for Chelan county, Grimshaw, J., entered December 26, 1910, upon a trial and conviction of murder in the first degree.   Affirmed.

7—67 WASH.

*Ira Thomas* (*Martin Rozema*, of counsel), for appellant.
*Fred Kemp* and *Ludington & Kemp*, for respondent.

FULLERTON, J.—The appellant, together with one Hannah
Beebe, was charged by an information, filed in the superior
court of Chelan county, with the crime of murder in the first
degree, for having, on August 10, 1910, in that county, shot
and killed one James E. Sutton.   The accused were awarded
separate trials; and on the trial of the appellant, the jury
found here guilty of murder in the first degree, as charged in
the information.   On the verdict of guilty, she was adjudged
guilty and sentenced to imprisonment in the penitentiary for
the term of her natural life.   From the judgment and sen-
tence, she appeals.

The facts leading up to the homicide are not seriously in
dispute.   On August 10, 1910, and for about ten years prior
thereto, Hannah Beebe, who is the mother of the appellant,
owned and occupied a tract of land originally containing one
hundred and sixty acres, situated some five miles southwest of
Cashmere, in Chelan county, in what is known as Brender
canyon.   Some time prior to August 10, Mrs. Beebe had
sold to the appellant a three and one-half acre tract out of
the west side of her one hundred and sixty acre tract; and
the appellant, together with her husband and son, lived
thereon, the husband owning other lands adjoining this tract
lying to the west of Mrs. Beebe's land.   The houses of the re-
spective parties were but a few rods apart, and were located
perhaps an eighth of a mile south of the northwest corner of
Mrs. Beebe's original tract.   To the west of Mrs. Beebe's
land, was the land of James H. Sutton, who lived upon it
with his family, consisting of his wife and six boys and four
girls; one of the boys being James E. Sutton, who was killed
as before stated.   The Sutton land was at the head of Brender
canyon, which maintained a northeasterly course through
this tract as well as the tract owned by Mrs. Beebe.   Mr.
Sutton also owned a forty-acre tract lying immediately to the

north of Mrs. Beebe's land, and abutting thereon. During the period that they had lived in the canyon, some four years, the Sutton family had made use of a private road which led from their home place in a northwesterly direction down through the land of Mrs. Beebe, through their other forty, and thence through other land to a county road leading to the town of Cashmere. Mrs. Beebe and the appellant also used this way to reach Cashmere, entering the road at a point opposite their houses and following it down through Sutton's forty-acre tract to the point where it intersects the county road. Brender canyon had formerly contained saw timber, and a number of logging roads had been constructed, branching off from the private road mentioned, and extending back through the land of Mrs. Beebe and the adjoining tracts. One of these roads connected with the private way but a short distance below the point where the road from the houses of Mrs. Beebe and Mrs. Totten connected therewith. This road extended for a short distance in a southerly direction, and for that distance paralleled the private traveled road. Mrs. Beebe's inclosures all lay west of the private way.

For some time prior to August 10, 1910, there had been ill feeling between the Sutton family and the appellant, arising from various causes, and between the Sutton family and Mrs. Beebe over the use of this private way; and on the 9th of August, Mrs. Beebe built a wire fence across the way, a short distance above the point where the road from her house connected therewith. The fence did not complete an inclosure, nor did it connect with any other fence Mrs. Beebe had upon her premises, but was intended to block the private way, and as an assertion of her rights to the land over which the road passed. Near the fence she placed a sign containing the words, "No Trespassing." That night the sign was demolished and the fence torn down where it crossed the way, as it developed on the trial, by some of the members of the Sutton family.

On the next morning, Mrs. Beebe drove to Cashmere for

the purpose of obtaining a warrant for the parties guilty of cutting the fence, but was unsuccessful for want of definite evidence as to who the guilty parties were. She returned home about noon, and going to the home of the appellant, discussed with her the cutting of the fence, and concluded to rebuild it. The mother then started for the fence, carrying with her some tools and materials, and was followed by the appellant some fifteen minutes later. The appellant carried with her a Winchester repeating shotgun, loaded with six shells. The two of them rebuilt the fence across the road, extending it a little farther in each direction than it was extended the day before. Mrs. Beebe also piled some brush in the logging road lying to the east of the traveled way, mentioned before as connecting with the traveled way a short distance below this point. Another sign was also put up. The appellant and her mother then took positions to the east of the road, about sixty feet therefrom, under the shade of a bush, and waited developments.

Some time later, perhaps about three o'clock in the afternoon, the elder Sutton drove down the road from his home with a load of wood, and seeing the fence across the road and the appellant and her mother sitting near it, stopped his team and came down to them. In the discourse which followed he was told that he could not go through, as the road was closed, and thereupon he returned to his team, pulled his load to one side of the road, unhitched his team and returned home with it. Shortly afterwards James E. Sutton, with his sister Nettie, some two years his senior, and his two younger brothers, aged fourteen and eleven years respectively, drove a single horse hitched to a buggy or hack down the road to the fence, stopping the horse some ten feet therefrom. Young Sutton immediately jumped out of the buggy and proceeded to cut the fence where it extended across the road, by putting the blade of an axe beneath a wire and striking on the wire with a hammer. As soon as he began cutting the wires, Mrs. Beebe arose and hastened down to the road, telling him not

to cut the wires, at the same time calling his attention to the sign. He remarked to her that he did not care for signs, and kept on with his work. She thereupon sought to interfere with him by striking at his hands with a little axe she carried with her, but did not succeed in stopping him.

While this was going on, the appellant arose, picked up the gun which had theretofore remained out of sight, and approached the road. The happenings from then on are in dispute, but Nettie Sutton testified, and in this she is supported in a measure by her two brothers, that the appellant called to her brother, saying that she would shoot him if he did not cease cutting the wire; that her brother's back was towards the appellant, and without looking towards her, he answered that if she shot him he would hit her with the hammer; that immediately after he had cut the last wire, the appellant called to her mother telling her, "to stand aside and she would shoot him;" that her brother turned at that moment, and seeing the appellant, who had then reached within about ten feet of the road, with the gun pointed at him, dodged towards a stump which stood by the road immediately to his right in an attempt to get the stump between himself and the gun. He only partially succeeded—the appellant herself saying that he was far enough behind it "so that I couldn't hit him in the legs"—and was shot by the appellant in the neck, dying almost instantly. Mrs. Totten testified that, at the time she shot young Sutton, he was advancing towards her with the hammer raised above his head in an attempt to strike her, and that she shot him in self-defense.

The assignments of error all go to the rulings of the court on the admissibility of evidence, and to the court's charge to the jury.

In her direct examination, the witness Nettie Sutton testified that the road across which the fence had been constructed by Mrs. Beebe was the only way from the Sutton home to the forty-acre tract and to Cashmere. On cross-examination, she modified the statement by saying that it was the only way

to reach those places with a vehicle. While the husband of the appellant was on the stand as a witness for the defense, he was asked concerning another way that the Sutton family could have passed over with a vehicle in going from their home to their lower forty and to Cashmere. To this evidence, an objection was interposed and sustained by the court. The appellant thereupon offered to prove by the witness that a hack containing four persons and drawn by one horse, such as the hack and horse testified to as having been driven on the day of the homicide by James E. Sutton, could easily have been driven over a route commencing some distance south of the point where the fence was placed across the road, and extending from thence in a northeasterly direction to the logging road mentioned before as lying immediately east of the traveled way, then on down the logging road to its connection with the traveled way, although "it is not pretended that there is any built or graded road at this place." The court adhered to its ruling, holding the evidence inadmissible. By the same witness, the appellant later on offered to show that the elder Sutton could have driven with his load of wood from a point on the traveled way a few rods south of the fence, thereon in an easterly direction to the logging road before mentioned and thence down the road to its connection with the traveled way a few rods below the fence. This evidence was likewise rejected. Again the appellant offered to prove by the same witness that he had driven around the fence subsequent to the homicide with a team. This offer of proof was likewise rejected.

The appellant's counsel argue the admissibility of this evidence on several grounds. It is contended, first, that it was admissible for the purpose of contradicting the state's witness Nettie Sutton; and second, that it was admissible as bearing upon the state of mind of the appellant at the time she committed the homicide. It is argued, also, that the evidence on the part of the state tended to show that the blocking of this road shut the Sutton's off from their home,

and served no useful purpose otherwise, thus putting the appellant in a bad light morally before the jury, while if she had been permitted to show that such was not the fact, the effect of the state's proof would have been mollified, and possibly induced the jury to render a verdict for a lesser degree of crime than the verdict they did render, or possibly induced them to consider with more favor the appellant's testimony as to the transactions immediately preceding the death of the Sutton boy than they apparently gave to it.

But we think none of these reasons require the admissions of the rejected evidence. If it were material to contradict the witness Nettie Sutton on the matter mentioned, it will be noticed that the proofs offered do not have that tendency. In the first place, the record makes it plain that the witness was referring to traveled ways, not the possibility of driving a team through the timber and over the underbrush between the points mentioned. Again, to go over the route described would not avoid the use of the fenced way entirely. It would simply have enabled the one pursuing it to pass around the fence, thus avoiding the use of the road for a few rods only; and to show this fact does not contradict in any material degree the statement that the fenced road is the only road between the points concerning which the witness testified. Evidence contradicting the statement of an opposing witness, to be admissible on that ground alone, must relate to some material matter; it must relate to the substance of the evidence, not to its mere technical accuracy.

Nor does the second ground stated require the admission of the evidence. It must not be forgotten that the appellant was not representing any right of her own by her presence at the time of the homicide. She was there solely as an assistant to her mother, and her mother makes it plain in her own testimony given on behalf of the daughter, that her purpose was to close the road to the Suttons for its entire way through the land, not merely that portion across which

the fence was stretched. If there were other ways, the Suttons were equally forbidden to travel them. This is further evidenced by the fact that the mother, in the presence of the appellant, threw brush in the logging road over which it was proposed to show a wagon could have been driven. The only possible purpose the testimony could serve was to show that the Suttons had incensed the mother by insisting on this particular way out when there were other ways at their disposal. But the foundation of this contention falls when it is shown that the mother herself intended to forbid trespassing upon the land in any manner.

The third branch of the contention is untenable on like grounds. Mrs. Beebe herself, as we say, made it plain that she intended by the fence and her protests to both the elder and younger Sutton to forbid them the use of the entire way, and the jury could not have inferred from the mere fact that she had left it possible for a wagon to be driven over the land, that she did not intend to cut them off entirely. Moreover, the state admitted on the trial, and the court charged the jury, that Mrs. Beebe acted wholly within her rights when she fenced the way in question. The jury were also charged that the person killed and the other members of the Sutton family were unlawfully trespassing on her property at the time of the homicide, and that the destruction of the fence was an unlawful act which Mrs. Beebe, and through her the appellant, had the right to resist to any degree short of taking human life, or the infliction of dangerous bodily harm. No additional light on the tragedy would have been thrown by the admission of the rejected evidence, and we find no reversible error in the court's ruling.

The appellant further offered to show by the husband of the appellant, that he, as the representative of Mrs. Beebe, sometime prior to the homicide, had visited the Suttons and told them that a certain gate in a fence extending across the road different from the one in question had been locked, that the key was with Mrs. Beebe, and that any time that

they wished to pass through the gate they could get the key by calling at Mrs. Beebe's house and asking for it; that James E. Sutton, the person killed, stated that he would not go for·the key, but would go through the gate in the morning; that subsequently the gate was found open and partially demolished; "but it is not pretended that we can prove by this witness that it was demolished or opened by any one of the Sutton family." These proofs were rejected, we think properly. Such evidence, if admissible at all, could only be for the purpose of showing the state of mind of the accused at the time of the homicide. But the mind of the appellant could not be affected by the fact offered to be shown unless the fact was known to her. There can be no presumption that it was so known. As we have said, the land was the property of Mrs. Beebe, not that of the appellant, and it is not shown, nor offered to be shown, that the appellant took up her mother's quarrel earlier than three or four hours before the homicide was committed.

The same answer can be made to the offer to show that Mrs. Beebe had offered to the elder Sutton a right of way across her land by another route on which a road could be constructed without great difficulty and on reasonable grades. It could not have any bearing upon the appellant's condition of mind, because it was not shown, nor offered to be shown, that she knew the fact.

The appellant offered to show that, at various times prior to the August 10, 1910, the appellant had expressed to her husband fear of certain members of the Sutton family, particularly James H. Sutton and James E. Sutton; that she was afraid they would do her bodily injury, particularly in the nighttime, and was afraid they would do bodily injury to the witness, her husband. The statements and declarations of the accused in her own favor, unless they are a part of the *res gestae*, or unless made evidence by the prosecution in producing conversations in which they are contained, are inadmissible as evidence on the part of the accused on ·

her trial for an offense to which they relate. Such statements and declarations are excluded, "not because they might never contribute to the ascertainment of the truth, but because if received they would most commonly consist of falsehoods, fabricated for the occasion, and would mislead oftener than they would enlighten." 12 Cyc. 426; *State v. Gates*, 28 Wash. 689, 69 Pac. 385.

The court, among others, gave the jury the following instructions:

"I now direct your attention to the crime of manslaughter, which is included within the crimes charged in the information; and I instruct you, as a matter of law, that if you are satisfied beyond a reasonable doubt from the evidence, that the defendant, Della Totten, did shoot and kill the deceased, James E. Sutton, in the manner alleged in the information, in this county and state, and further find that such killing was not purposely done and was not done upon deliberation and with a premeditated design to effect the death of deceased, but was done by the defendant without any design to effect his death, and that it was done either voluntarily upon sudden heat or involuntarily but in the commission of some unlawful act and are satisfied beyond a reasonable doubt that it was not in self-defense, then your verdict should be that the defendant is guilty of manslaughter. In order to reduce voluntary homicide to the grade or degree of manslaughter, it is necessary, not only that adequate cause exist to produce a degree of anger, rage and sudden resentment or terror sufficient to render the mind incapable of cool reflection, but also that such a state of mind did actually exist at the time of the commission of the offense.

"The court instructs you, as a matter of law, that if a homicide, that is, the killing of one human being by another, is proven beyond a reasonable doubt, as explained to you, the presumption of the law is that it is murder in the second degree; and, if the state would elevate it to that of murder in the first degree, it must establish all the statutory characteristics of murder in the first degree from the evidence and beyond a reasonable doubt; that, on the other hand, if the defendant would reduce it to manslaughter, or justify it, the burden is upon the defendant so to do. This burden on the defendant is sustained, if, from all the evidence in the case, or want

of evidence in the case, you entertain a reasonable doubt as to the defendant's guilt.

"You are further instructed that the law presumes the innocence of a person accused of crime and this presumption is not a matter of form merely, which the jury may disregard at pleasure, but is a part of the law of the land and is a right guaranteed by that law to every person accused of crime; this presumption of innocence continues with the defendant throughout all the stages of the trial and until the case has been finally submitted to the jury and the jury has found that this presumption has been overcome by the evidence of the prosecution in the case, beyond a reasonable doubt as to each and every material fact."

It is objected to the first instruction that it is confusing, inasmuch as it does not sufficiently distinguish manslaughter from murder in the second degree; the precise contention being that the terms "voluntarily" and "involuntarily" as used in the instruction were capable of a varied meaning. But we think the instruction free from fault in this regard. The statute, it will be remembered, defines manslaughter by words of exclusion, rather than by words of inclusion.    It first prescribes that homicides committed in certain ways shall constitute murder in the first degree, next that homicides committed in certain other ways shall constitute murder in the second degree, and then prescribes that all homicides committed in ways other than there specified, not being excusable or justifiable, shall be manslaughter.    The court was therefore compelled to resort to a somewhat circuitous method of making clear to the jury the acts constituting manslaughter, and in doing so we do not think he misused the particular terms complained of, or that such terms are not in such common use as to be readily understood by jurors without further definition.

The second instruction is objected to, "because," to use the words of counsel, "its effect is to tell the jury that before the burden of reducing the homicide to manslaughter is sustained by the defendant the jury must entertain a reasonable doubt of the defendant's guilt."

But an instruction in this form was approved by us in *State v. Melvern*, 32 Wash. 7, 72 Pac. 489, where it was said:

"A substantially similar instruction was considered and sustained by this court in *State v. Payne*, 10 Wash. 545, 39 Pac. 157, on the authority of *State v. Cain*, 20 W. Va. 679, 709; *Hill v. Commonwealth*, 2 Grat. 594, and other cases cited in the opinion, and 2 Thompson. on Trials, § 2208. This instruction is an exact copy of the form of an instruction given by Thompson in the section of his work on trials above noted; and the learned author, in a footnote to said section, says that, 'The principle embodied in the above instruction is believed to be universally acknowledged.' "

The precise objection now urged against the instruction was not made in the case cited, but we think the instruction without error nevertheless. The natural and obvious meaning of the language used is directly contrary to the interpretation put upon it by the appellant, and we think the jury could not have misunderstood the instruction.

To the third instruction counsel made the following criticism:

"The error in this instruction is that it virtually instructs the jury that the presumption of innocence could be overcome if they believed the evidence of the prosecution in the case and excludes them from inquiring into the question as to how far the testimony on the part of the prosecution was modified or neutralized by that produced by the defendant, or what inference should be drawn from any of it."

We think the criticism unjust. It is true, the instruction does not contain the modification suggested by counsel, but it is not practicable for the court to incorporate in each paragraph the exceptions and modifications of the general rules there announced. It is sufficient if the charge as a whole contains these modifications. Elsewhere in its charge, in this instance, the court made it clear to the jury that the whole of the testimony bearing upon any particular fact must be considered by them in arriving at a conclusion as to such fact.

There is no substantial error in the record and the judgment will stand affirmed.

MOUNT, PARKER, and GOSE, JJ., concur.