[No. 26567. *En Banc.* August 23, 1937.]

THE CITY OF SEATTLE, *Respondent*, v. ROSE FRANKLIN, *Appellant.*[1]

*Wright & Wright,* for appellant.

*A. C. Van Soelen, George T. McGillivray,* and *Tom M. Alderson, Jr.,* for respondent.

MAIN, J.—The defendant was charged, by complaint in the police court, with disorderly conduct, in that she took and appropriated to her own use, with intent to deprive the owner of the use thereof, certain articles of merchandise from a department store in Seattle. She was convicted in the police court and appealed to the superior court, where a verdict was returned finding her guilty, with the recommendation of leniency. The trial court sentenced her to thirty days in the city jail, and suspended the sentence during good behavior. It is from this judgment and sentence that the appeal is taken.

The facts may be stated as follows: Sometime during the afternoon of May 14, 1936, the appellant and

[1]Reported in 70 P. (2d) 1049.

another lady entered the Rhodes department store in Seattle, and, while there, as testified to by a store detective, the following occurred:

"Q. What was she doing at that time? A. She was with that other woman and they each had shopping bags, and I came up then and they then went on looking around, going from counter to counter, and going into huddles and examining the merchandise. . . . Q. Just state to the jury what happened that day and tell what she did. . . . A. She held a coat for Mrs. Kalgard which Mrs. Kalgard picked out a jacket that looked good to her and she took it and put it on, and Mrs. Franklin was right there at the time, and she put it on and put her coat over it. Then she went up to the lingerie and picked out a slip and some bloomers they wanted, and they put them in the bag. Then they went down to childrens suits, picked out two little boy's suits in the size and color they wanted and they went in one of the bags, in Mrs. Franklin's bag were two little suits. Then they went in the stockings and Mrs. Franklin went around the table and picked out the size she wanted in the box and the two of them were right up together and Mrs. Franklin put them in the bag. Then they went over in the—they went almost to the entrance but they stopped at the shirt counter and Mrs. Kalgard went up the stairs and I went upstairs a little way and Mrs. Franklin stopped at the men's shirts and picked out a shirt and put that in the bag and went upstairs. Q. At that time you were in view of both Mrs. Kalgard and Mrs. Franklin? A. Yes, at all times."

The assistant manager in the basement of the Rhodes department store testified as follows:

"Q. When and where did you first see the defendant to the best of your recollection? A. It was between two and three o'clock in the basement on the 14th of May. By checking at my records it was the 14th of May. Q. What was she doing at that time? A. She was at the shirt counter. Q. How far away were you from her? A. I was to the best of my judgment fifteen or twenty feet from her. Q. What did you see her do

at that time? A. I saw her take a shirt from the counter and put it in her bag. Q. What kind of a bag? A. It was just a common, ordinary paper shopping bag. Q. What did she do then? A. Walked up to meet an older lady who was standing on the stairs and went out of the store."

Thereafter, the two ladies were arrested, and the appellant in this case was tried in the police court and in the superior court, with the result above stated. We are not here concerned with the case against the other lady.

Upon both trials, the appellant denied that she had taken anything from the store, or that she cooperated with the other lady in doing so, and there was presented a question for the jury. Taking the description of what occurred, as it appears in the testimony of the store detective and the assistant manager, the question is whether the appellant was guilty of "disorderly conduct."

An ordinance of the city of Seattle provides that:

"It shall be unlawful for any person to be guilty of fighting, drunkenness or of riotous or disorderly conduct, or of any conduct tending to disturb the public peace, or to use any profane or abusive language, or to engage in any act or practice whereby the peace or quiet of the city may be disturbed, or to use any obscene language or be guilty of any indecent or immoral act, practice or conduct tending to debauch the public morals."

Eliminating from this ordinance everything but the matter covering "disorderly conduct," it would read as follows:

"It shall be unlawful for any person to be guilty of . . . disorderly conduct, . . ."

If the articles were taken from the store, as the witnesses testified, then, of course, the appellant would be

guilty of larceny, which, it is needless to say, is a crime.

We now come to a consideration of the meaning and application of the words "disorderly conduct."

In *State ex rel. Tyrrell v. Jersey City*, 25 N. J. L. 536, the court had under consideration the meaning of these words, which appeared in the charter of the city of Jersey City, and in the charter it was provided that the common council had power to "expel a member for disorderly conduct." One of the members of the council accepted a bribe, and the other members expelled him from the council for that reason, on the ground that the accepting of the bribe was disorderly conduct within the meaning of the charter, and it was there held that the receiving of bribes for his official conduct was disorderly conduct on the part of the offending member within the meaning of the charter.

In *Pratt v. Brown*, 80 Tex. 608, 16 S. W. 443, it was held that one who entered a railway depot, considerably under the influence of intoxicating liquors,

". . . and in a short time he lay down on one of the seats in the waiting room and slept until the train reached Bonham, when he was awakened by one of the defendant's employes and asked if he desired to leave on that train, when he declined to do so, and again went to sleep,"

was guilty of disorderly conduct. The intoxicated person was at no time noisy or disorderly. In the course of the opinion, it was said:

"By his own voluntary acts he superinduced the necessity, or at least the cause of his arrest. 'Disorderly' does not only mean 'confused' or out of order, but also 'lawless' or contrary to law.—*Webster*. There is good authority for holding that 'any conduct which is contrary to law is within the definition of disorderly conduct as given by standard lexicographers.' [Citing the New Jersey case above cited.]"

In *Walsh v. City Council of Trenton,* 186 Atl. (N. J. Law) 818, the court had before it a provision of the charter of the city of Trenton, in the state of New Jersey, which provided that a member of the common council could be expelled for "disorderly conduct." The disorderly conduct in that case, as alleged, consisted of a number of things, such as unlawful acts for the member's own personal gain and failure to disclose the known embezzlements of others under his jurisdiction. With reference to the meaning of disorderly conduct, it was there said:

"The charges in question are grave. They involve moral turpitude, violations of public duty, and the like. Are they within the language and intendment of the phrase 'disorderly conduct' as written in section 20 of the charter? We consider that any act which violates the Criminal Code is certainly disorderly conduct and more, and that therefore the charges in this case are within the purview of the section under which the prosecutor was tried. *State ex rel. Tyrrell v. Jersey City,* 25 N. J. Law, 536."

There are cases, most of which, so far as we are informed, appear in the New York Supplement and in the Georgia Court of Appeals Reports, which hold that disorderly conduct must be such as tends in some degree to disturb the peace or good order of the town or has "a vicious or injurious tendency," or such, if allowed to go unchecked, as will bring about a "condition of unrest and create a disturbance," or such as is calculated to "disturb or annoy." These cases, however, fail to recognize the difference between disorderly conduct and conduct tending to disturb the public peace. *People v. Arko,* 40 N. Y. Crim. Rep. 149, 199 N. Y. Supp. 402; *Garvin v. Waynesboro,* 15 Ga. App. 633, 84 S. E. 90; *State v. Moore,* 166 N. C. 371, 81 S. E. 693.

The case of *Pavish v. Meyers,* 129 Wash. 605, 225 Pac. 633, 34 A. L. R. 561, is not here in point, because

that case has to do with a section of the ordinance covering the matter of conduct which tended to disturb the public peace.

There is a difference between disorderly conduct and conduct tending to disturb the public peace. Disorderly conduct is a broader term than breaching or disturbance of the peace, because a person who commits a breach of the peace is necessarily guilty of disorderly conduct, but all disorderly conduct is not necessarily a breach of the peace. 18 C. J. 1216; *Garvin v. Waynesboro,* 15 Ga. App. 633, 84 S. E. 90. If, however, it should be assumed, in order to constitute disorderly conduct, it is necessary that there be something done which would be calculated to "disturb or annoy," or which had "a vicious or injurious tendency," or which would tend to bring about "a condition of unrest or create a disturbance," then it could well be argued that entering a store and committing larceny, or what is generally referred to as shoplifting, was conduct which would meet these tests.

It is said by the appellant that she was charged with one crime and convicted of another, because the evidence showed that she was guilty of larceny, and she was found guilty of disorderly conduct. The answer to this is that disorderly conduct is an included offense.

Complaint is also made of instruction No. 6, which the court gave to the jury. An instruction in exactly the same language was approved in the case of *State v. Melvern,* 32 Wash. 7, 72 Pac. 489, and, so far as we are informed, the holding in that case has never been departed from.

The judgment will be affirmed.

STEINERT, C. J., BLAKE, TOLMAN, BEALS, GERAGHTY, and ROBINSON, JJ., concur.

MILLARD, J. (dissenting)—The city ordinance provides, in effect, that it shall be unlawful for any person to be guilty of disorderly conduct. The term "disorderly conduct" does not designate any offense known to the common law. 18 C. J. 1216. It is a statutory offense, and the general rules of criminal law relative to charging statutory offenses apply.

"Disorderly conduct is a statutory offense, and the general rules of criminal law relative to charging statutory offenses apply. All of the essential elements of the offense, as prescribed by the statute or ordinance, must be charged by direct allegations. Where the words of the statute or ordinance are descriptive of the offense, it is ordinarily sufficient to charge the offense in the language of the statute or ordinance or in words of similar import. So, where the offense consists of disturbing the peace generally, or the peace of a family or class of persons by prescribed acts, language, or conduct, it is sufficient to charge the offense in the language of the statute, without specification of particular acts done or language used. Where, however, the provisions of the statutes and ordinances are in general terms which do not fully describe the offense, then the accusation must set out such facts as will make it reasonably certain what charge defendant is required to meet." 18 C. J. 1223.

I note the statement from 18 C. J. 1216, incorporated in the majority opinion, that the phrase, "disorderly conduct," is broader than the phrase "breach of the peace." I am not unmindful of the holding in the cases cited to sustain the majority opinion. In passing, it may be said as many or more cases may be cited supporting the position that the phrase "disorderly conduct," standing undefined, constitutes no offense.

It is true that lexicographers define "disorderly conduct" as conduct which is offensive to good morals and public decency. That definition, of course, was taken from the opinion of some court which arrogated to

itself the right to define the crime of disorderly conduct. Surely it would not be contended that if one were charged with being an habitual criminal, that the courts could define the offense, if the legislative enactment prescribing the penalty failed to state the number of times one must be convicted of a crime before he could be adjudged an habitual criminal. It should be borne in mind that the dictionary defines an "habitual criminal" as a person who is legally considered to do criminal acts by force of habit.

The creation or definition of criminal offenses is a legislative function not delegable to courts. If the majority hold, as it has the power to do, that disorderly conduct is an included offense in the crime of larceny and for such undefined offense one may be arrested and punished, I shall, of course, in the future be bound thereby. I am not yet ready to concur in the view that courts may arrogate the right of creation or definition of criminal offenses, particularly such an offense as is charged in the case at bar.

I also agree with the contention of counsel for appellant that the effect of one of the instructions was to discredit the appellant as a witness, and for that reason, at least, the appellant is entitled to a new trial.

The judgment should be reversed and the action dismissed.

HOLCOMB, J., concurs with MILLARD, J.